Sabita J. Soneji (SBN: 224262)
*ssoneji@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
Telephone: (510) 254-6808

*Counsel for Plaintiff and the Proposed Class*

[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

MICHAEL CRIBIER, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

COMPASS, INC.,

Defendant.

Case No.: 3:25-cv-01833-RBM-VET

**FIRST AMENDED CLASS ACTION COMPLAINT**

**VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT OF 1991, 47 U.S.C §§ 227, *ET SEQ.***

**DEMAND FOR JURY TRIAL**

Plaintiff MICHAEL CRIBIER ("Plaintiff"), individually and on behalf of the proposed Classes defined below, brings the following first amended class action complaint against Compass, Inc., and DOES 1-100 (collectively "Defendant"). Plaintiff alleges as follows:

## INTRODUCTION

1. Defendant operates the largest independent real-estate brokerage in the United States, with over 300 offices nationwide and more than 28,000 real estate

agents.[1]

2. Defendant contracts with tens of thousands of real estate agents across the country (collectively, the "Agents" or "Compass Agents"), who drive business for Defendant by identifying leads and turning those leads into home sales under the Compass brand name.

3. One way the Compass Agents drive home sales for Defendant is to "cold call" or "cold text" residential and cellular telephone numbers directly to market their real estate services and the Compass brand to the call and/or text recipients.

4. Defendant not only authorizes and ratifies the Agents' practice of cold calling or cold texting residential and cellular telephone numbers directly to market Defendant's real estate services - it also welcomes the financial benefits of the increased home sales that the cold calls and texts generate.

5. In its zeal to find clients and get more commissions, the Defendant has failed to take sufficient precautions to ensure its Agents do not engage in harassing telephone practices.

6. In particular, Defendant has failed to adopt sufficient procedures to ensure its Agents do not call potential customers who are not on the National Do Not Call Registry ("NDNCR"). This practice violates the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, *et seq.* ("TCPA"), and its implementing regulations.

7. Defendant likewise failed to adopt procedures to ensure its Agents do not contact numbers assigned to a cellular telephone service using an automatic dialing system or prerecorded voice without prior express written consent, another practice that violates the TCPA.

8. To increase their revenues, Defendant encourage and permit their Agents to partner with various autodialing and auto-texting companies and platforms, which in turn provide the Agents with the capacity to harass a larger number of people with

---

[1] *Google Chrome*, https://www.compass.com/about (last accessed March 24, 2025).

unwanted calls and texts.

9. The Compass Agents make these cold calls and texts on behalf of and as agents of Defendant for reasons including but not limited to the following:

a. Defendant profits from every home sale made by each Compass Agent and has a financial interest in ensuring the Agents can market themselves widely and quickly.

b. It is Defendant that designs the Compass Agents' cold calling/texting policies and oversees Agent training, and it has either neglected to design, or designed and weakly implemented an insufficient process for "compliance" with the TCPA, which it knows the Agents fail to follow. In the event a TCPA compliance process was put in place, Defendant has authorized and ratified the Agents' failure to follow the TCPA "compliance" process Defendant designed.

c. Defendant knows of, approves, and ratifies the Agents' conduct in connection with making the cold calls and texts at issue, including the following: (1) the Agents' use of Defendant's intellectual property, such as the "Compass", or "Urban Compass" brand names; and (2) the Agents' use of texting and cold-calling platforms to make the calls and texts.

10. Plaintiff and thousands of people nationwide are victims of Defendant's reckless cold calling and texting practices. They received numerous unwanted marketing calls and texts that were for the purpose of advertising the Defendant's Compass real estate business. These calls and texts were placed without regard to anyone's status on the NDNCR and without regard to prior complaints made to Defendant. These calls were likewise without regard to the fact that Plaintiff and class members did not provide prior express written consent to be contacted using an automatic dialing system or prerecorded voice.

11. Because Defendant engages in and profits from pervasive cold calling and texting that results in violations of the TCPA, Plaintiff brings this class action complaint for damages, restitution, injunctive relief, and any other available legal or equitable remedies, resulting from Defendant's unlawful calls to their residential and mobile telephone lines, in violation of the TCPA.

## JURISDICTION AND VENUE

12. This Court has federal question subject matter jurisdiction over this class action lawsuit pursuant to 28 U.S.C. § 1331 as Plaintiff alleges violations of a federal statute, the TCPA.

13. The Court has specific personal jurisdiction over Defendant because Defendant conducts significant business in this District, and targeted its conduct in this district by placing calls to Plaintiff from this District concerning real property located in this District.

14. This Court has original jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d) because Plaintiff and the members of the Classes have suffered aggregate damages exceeding $5,000,000, exclusive of interests and costs, and this case is a class action in which a member of the Classes is a citizen of a state different from Defendant.

15. Venue is proper in the United States District Court for the Southern District of California pursuant to 18 U.S.C. § 1391(b) because Defendant is Defendant regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

16. Plaintiff is a citizen of the State of Nevada. Plaintiff was previously a citizen of the State of California and owns real property in the County of San Diego in California. Plaintiff is, and at all times mentioned herein was, a "person," as defined by 47 U.S.C. § 153(39).

**<u>Defendant Compass, Inc.</u>**

17. Defendant Compass, Inc. ("Compass") claims to be "the largest residential real estate brokerage in the United States by sales volume."[2]

18. Defendant Compass has its principal place of business and headquarters located at 110 fifth Avenue, 3rd Floor, New York, NY 10010. Defendant Compass is, and at all times mentioned herein was a "person," as defined by 47 U.S.C. § 153(39).

19. Plaintiff alleges that at all times relevant herein, Defendant Compass conducted business in the State of California and in the County of San Diego, and within this judicial district.

## <u>FACTUAL BACKGROUND</u>

### A. Overview of the TCPA.

20. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In doing so, Congress recognized that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy…." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(5) (1991) (codified at 47 U.S.C. § 227).

21. The TCPA was designed to prevent calls and messages like those described within this Complaint, and to protect the privacy of citizens like Plaintiff. "Voluminous consumer complaints about abuses of telephone technology – for example, computerized calls dispatched to private homes – prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

22. Specifically, the TCPA restricts telephone solicitations (*i.e.,* telemarketing) and the use of automated telephone equipment, as well as violations of

---

[2] *Google Chrome*, https://www.prnewswire.com/news-releases/compass-inc-reports-fourth-quarter-and-full-year-2024-results-302379341.html (last accessed March 25, 2025).

the TCPA's National Do-Not-Call provision of 47 C.F.R. § 64.1200(c).[3] The TCPA limits the use of automatic dialing systems, artificial or prerecorded voice messages, SMS text messages, and fax machines. It also specifies several technical requirements for fax machines, autodialers, and voice messaging systems–principally with provisions requiring identification and contact information of the entity using the device to be contained in the message.

23. In 2003, the Federal Communications Commission ("FCC") promulgated regulations that created the National Do Not Call Registry ("NDNCR"). *See* 47 C.F.R. § 64.1200(c)(2). The NDNCR is a list containing the residential and cellular telephone numbers of individuals who affirmatively indicate they do not wish to receive unsolicited calls from commercial telemarketers. Do not call registrations must be honored indefinitely. *Id.*

24. In addition to its broad prohibition on calls to any number listed on the NDNCR, the TCPA prohibits *any* telemarketing call "unless such [entity] has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls by or on behalf of that [company]." §64.1200(d). The "minimum standards" for these procedures include training of personnel engaged in marketing on the existence and use of an internal do-not-call list, placing an individual's phone number on that internal do-not-call list, and honoring that request within no more than 30 days of its receipt. *Id.* An entity violates the TCPA if it initiates a phone call without having implemented the minimum procedures.

25. Today, over 258 million telephone numbers are on the National Do Not Call Registry.[4]

---

[3] According to the Federal Communications Commission's website, https://www.fcc.gov/consumers/guides/wireless-phones-and-national-do-not-call-list, accessed on June 3, 2021: Placing telemarketing calls to wireless phones is - and always has been - illegal in most cases.

[4] *Google Chrome*, *FTC Releases Annual Do Not Call Registry Data Book, Fed. Trade Comm'n* (Dec. 11, 2025), available at https://www.ftc.gov/news-events/news/press-

26. Despite the widespread embrace of the NDNCR, companies like Defendant flagrantly ignore the Registry and invade the privacy of consumers with unwanted calls.

27. In enacting the TCPA, Congress intended to give consumers a choice as to how creditors and telemarketers may call them and made specific findings that "[t]echnologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer." TCPA, Pub.L. No. 102-243, § 11. Toward this end, Congress found that:

> Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

*Id*. at § 12; *see also, Martin v. Leading Edge Recovery Solutions, LLC*, 2012 WL 3292838, at *4 (N.D. Ill. Aug. 10, 2012) (citing Congressional finding on TCPA's purpose).

28. Congress also specifically found that "the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call […]." *Id*. At §§ 12-13; *see also, Mims*, 132 S. Ct. at 744. Indeed, Congress noted that such calls were an even greater nuisance and invasion of privacy than live solicitation calls.

29. As Judge Easterbrook of the Seventh Circuit explained in a TCPA case regarding calls to a non-debtor similar to this one:

---

releases/2025/12/ftc-releases-annual-do-not-call-registry-data-book (last accessed March 3, 2026).

> The Telephone Consumer Protection Act […] is well known for its provisions limiting junk-fax transmissions. A less litigated part of the Act curtails the use of automated dialers and prerecorded messages to cell phones, whose subscribers often are billed by the minute as soon as the call is answered – and routing a call to voicemail counts as answering the call. An automated call to a landline phone can be an annoyance; an automated call to a cell phone adds expense to annoyance.

*Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638 (7th Cir. 2012).

30. Text messages are calls and are subject to the TCPA. *See, e.g.*, *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 666 (2016); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009).

31. 47 C.F.R. § 64.1200(a)(2) additionally states, with respect to advertisement and telemarketing calls—of which Defendant's texts to Plaintiff are—that "[n]o person or entity may . . . [i]nitiate or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, other than a call made with the prior express written consent of the called party …"

32. 47 C.F.R. § 64.1200(f)(8) defines "prior express written consent" as "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered."

33. As of October 16, 2013, unless the recipient has given *prior express written consent*, the TCPA and Federal Communications Commission ("FCC") rules

under the TCPA generally:

- Prohibit solicitors from calling residences before 8 a.m. or after 9 p.m., local time.
- Require that solicitors provide their name, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which that person or entity may be contacted.
- Prohibit solicitations to residences that use an artificial voice or a recording.
- Prohibit any call or text made using automated telephone equipment or an artificial or prerecorded voice to a wireless device or cellular telephone.
- Prohibit any call made using automated telephone equipment or an artificial or prerecorded voice to an emergency line (*e.g.*, "911"), a hospital emergency number, a physician's office, a hospital/health care facility/elderly room, a cellular telephone, or any service for which the recipient is charged for the call.
- Prohibit autodialed calls that engage two or more lines of a multi-line business.
- Prohibit unsolicited advertising faxes.
- Prohibit certain calls to members of the National Do-Not Call Registry.

34. The TCPA also provides that liability should be imposed when calls are made on behalf of an entity or person. 47 U.S.C. § 227(c)(5). In its implementing regulations and interpretations, the FCC has determined that this statutory mandate is broad, and that vicarious liability applies where there is apparent authority, actual authority, ratification, or, under the express terms of § 227(c), when unlawful calls are placed "on behalf of" the seller. *In re Joint Pet. Filed by Dish Network*, 28 FCC Rcd. 6574 (2013).

35. Accordingly, the entity can be liable under the TCPA for a call made on its behalf, even if the entity did not directly place the call. Under those circumstances, the entity is deemed to have initiated the call through the person or entity.

36. The TCPA provides for damages in the amount of $500 for each negligent violation and $1,500 for each knowing violation. *See* 47 U.S.C. § 227(b)(3).

**B. Defendant has Executed a Nationwide Cold Calling Scheme That Has Unlawfully Harassed People Around the Country.**

**i. Defendant Operate a Large Real Estate Conglomerate That Directs and Supervises Agents to Sell Real Estate Under Their Compass Brand on Their Behalf.**

37. Defendant is one of North America's largest real estate conglomerates.

38. As of March 24, 2025, Defendant represents that over 28,000 agents operate under the Compass umbrella.[5]

39. Each Compass Agent affiliates with Defendant Compass and holds themself out as a real estate agent under the Compass brand. The Defendant allows each of the Compass Agents to have a designated webpage that lists the Agent's contact information, short biography, and the homes for which they represent Compass. People interested in buying and selling homes in a specific geographic area can find a Compass Agent by searching the Compass website to help them do so. When a home is sold, the payment is received by Defendant; Defendant then pays the Agent a commission while Defendant also receive a portion of the profit.

40. To become a Compass Agent and be able to help people buy and sell homes through the Compass brand, a person must first apply and be accepted for such a role by the Defendant. In other words, individuals cannot just simply decide to hold themselves out as being a Compass representative; instead, every Compass Agent has received an affirmative authorization from Defendant, to hold themselves out as such.

41. Because homeowners typically only contract with one real estate brokerage

---

[5] *Google Chrome*, https://www.compass.com/about (last accessed March 24, 2025).

to assist them in selling their homes, and competition in the real estate market is fierce, Defendant has an incentive to obtain as many home listings as possible to increase their profits.

42. Moreover, if a real estate brokerage has a large share of the listings for homes for sale in a given geographic market at a given time, it can use its market power to raise the prices on the homes it has for sale, since fewer competing listings can undercut the real estate brokerage with lower home prices. Due to Defendant's large number of affiliated agents, they are able to capture large shares of the market in given regions, and they have tremendous incentive to obtain more and more home listings to be able to keep real estate prices high.

43. The Compass Agents do not operate independently. Rather, each one operates in accordance with the Defendant's policies and procedures to ensure continuity in customer service, and to protect the reputation of the Compass brand, which, in turn, ensures more profits for Defendant.

**ii. Defendant Knows That Compass Agents Engage in Cold Calling to Sell Real Estate on Their Behalf.**

44. Defendant knows that it is standard practice in the real estate field to use cold calling and telephone solicitation to generate new business, and they know and expect that their Compass Agents will employ these strategies when selling real estate on their behalf.

45. As is typical to the industry and known to Defendant, Compass Agents often scan real estate listings that are from competitors, are for sale by owner ("FSBO"), or are expired to identify individuals who might be in the market for a new real estate agent, and they cold call these homeowners to try to convince them to retain the Agent to list the property.

46. Compass Agents also prospect for potential home buyers or sellers by cold calling homeowners or renters in targeted geographic areas, including in the vicinity of existing listings, open houses, or recent sales. Defendant provides training on and

gives Compass Agents access to various lead generation services which allows Compass Agents to download residents' contact information, including phone numbers, to make such geo-targeted cold calls.

47. Compass Agents can also sign up for other services that provide them with leads and contact information. As is common to the industry, Compass Agents will mine other sources of information for potential home buyers' or sellers' phone numbers, for example, by forming relationships with third parties who supply the Compass Agents with phone numbers.

48. Compass Agents, like others in the industry, also search for prospective homebuyers, often buying lists of prospective customers from real estate aggregator services, such zillow.com or realtor.com.

**iii. Defendant Knows, Ratifies, and Authorizes Their Agents to Use Autodialing Software to Dial Millions of Numbers.**

49. Because placing individual calls one by one often can be cumbersome and time consuming, those working to drive business in the real estate industry often use autodialer platforms.

50. Autodialers provide software that permits businesses to: (1) increase the number of people they call in a given time period, and (2) deliver both prerecorded messages and text messages on a widespread basis to large numbers of recipients over the phone.

51. By using autodialing, callers can reach far more people than they would if they were directly calling or texting.

52. As a result, the use of autodialers is common in the real estate industry.

**a. Defendant Knows, Ratifies, and Authorizes the Use of Autodialing Software by Compass Agents to Increase Their Profits.**

53. Defendant knows, authorizes, and ratifies the Compass Agents' usage of autodialing systems and software.

54. First, as set forth in Paragraphs 49-52, use of autodialers is common in the

sales and real estate industries. Defendant, as a leader in the real estate field, is familiar with sales practices and this trend.

55. Defendant promotes the use of autodialing platforms, and in fact have developed and utilize their own proprietary Real Estate Customer Relationship Management ("CRM"), which provides autodialing features.[6]

56. Additionally, Defendant promotes and provides online training programs to the Compass Agents, while knowing those training programs both encourage and instruct agents on the use of autodialers. Defendant know its agents attend these workshops, and Defendant suggests that Compass Agents attend.

57. In making cold calls, either directly or through autodialers, Compass Agents always identify that they are calling on behalf of Compass. Defendant knows that the Compass brand is a critical piece of information to prospective customers and is essential in building client trust. Real estate is a massive investment that involves the exchange and disclosure of highly sensitive personal information. Thus, Defendant knows that to increase its profits, it must authorize the Compass Agents to hold themselves out as calling on Defendant's behalf by referencing the Compass brand, and they have in fact so authorized and ratified that behavior. In every answered call placed by a Compass Agent to Plaintiff, that Agent identified the Compass brand on whose behalf they placed the call, under the knowing approval of Defendant.

58. Because the Compass brand is mentioned in every call received, reasonable people who receive these calls believe and understand that the call is being laced by, and on behalf of, Compass and not only by the individual Compass Agent with whom they are speaking. Defendant knows that this is how call recipients understand who the caller is.

---

[6] *Google Chrome*, https://support.therealbrokerage.com/hc/en-us/articles/5600210539543-What-is-Lofty (Last accessed on June 10, 2024).

### iv. Defendant Routinely Violates the TCPA with Harassing Phone Calls to People on the National Do Not Call Registry.

59. Defendant's business practices violate the TCPA, as they cause people to be called often repeatedly, notwithstanding the fact that their numbers are listed on the National Do Not Call Registry ("NDNCR").

60. The FCC's regulations at 47 C.F.R. § 64.1200(c)(2) prohibits Defendant from placing calls to numbers on the NDNCR, but Defendant does nothing to ensure that the Compass Agents do not place any such calls. Defendant knows that their cold-calling practices have caused and will cause unwanted calls to people on the NDNCR but allow the calls to continue to increase their profits.

61. When Compass Agents place calls through an autodialer platform, including but not limited to platforms created by, recommended by, and/or partnered with by Defendant, Compass Agents call people on the NDNCR in violation of 47 U.S.C. § 64.1200(c)(2). Defendant does not vet lists provided to and used by Compass Agents to dial by comparing them to the NDNCR.

62. Defendant has not taken adequate steps to prevent Compass Agents from calling people on the NDNCR. Defendant has not adopted sufficient written procedures, training programs, or a process that they know will actually prevent Compass Agents from calling numbers on the NDNCR.

63. Defendant's written procedures are inadequate and do not comply with 47 U.S.C. § 64.1200(c)(2)(i)(A).

64. Defendant's training is inadequate and does not comply with 47 U.S.C. § 64.1200(c)(2)(i)(B).

65. Defendant does not maintain and record a list of telephone numbers that their Agents may not contact pursuant to 47 U.S.C. § 64.1200(c)(2)(i)(C).

66. Defendant does not use any process to prevent telephone solicitations of any number on the NDNCR and does not maintain records documenting their process pursuant to 47 U.S.C. § 64.1200(c)(2)(i)(D), or to the extent they attempt to use such

processes, they remain out of compliance with NDNCR regulations.

**v. Defendant Routinely Violates the TCPA by Sending Prerecorded Messages.**

67. Defendant's business practices violate the TCPA when Compass Agents use an automatic dialing service to leave prerecorded messages or cold call potential leads by calling persons using an automatic dialer or a prerecorded message without prior express written consent.

68. Defendant also violates the TCPA by calling potential leads and leaving messages with an artificial voice without prior express consent.

69. The calls described herein are not placed for emergency purposes.

**C. Plaintiff Michael Cribier's Experience.**

70. Plaintiff Michael Cribier registered his cell phone number ending in 2907 on the National Do Not Call Registry on December 14, 2004.

71. Mr. Cribier uses his cell phone number for personal use only - and did so at the time he was sent phone calls by Dominic Pacheco and Ramon Maldonado, Compass Agents working under the Compass brand at the relevant times. Despite this fact, Mr. Cribier was called multiple times by Dominic Pacheco and Ramon Maldonado to see if he was interested in engaging their services as listing agents.

72. On or about March 11, 2025 at 8:50AM, Mr. Cribier received the **first** unwanted telemarketing call from Compass, through its former agent Dominic Pacheco from telephone number (858) 252-7206. As Mr. Cribier did not recognize the number calling him, he opted not to answer the call.

73. On or about March 11, 2025 at 9:49AM, Mr. Cribier received the **second** unwanted telemarketing call from Compass, through its agent Ramon Maldonado from telephone number (619) 853-6918. Once again, as Mr. Cribier did not recognize the number calling him, he opted not to answer the call.

74. On or about March 12, 2025 at 12:37PM, Mr. Cribier received the **third** unwanted telemarketing call from Compass, through its former agent Dominic Pacheco,

again from telephone number (858) 252-7206. As Mr. Cribier recognized the number calling him as one that had previously called him the day before, he opted to answer.

75. (858) 252-7206 is a phone number produced by Compass' autodialing system, and is unique to calls placed by Dominic Pacheco.

76. When Mr. Cribier answered the phone call, Dominic Pacheco introduced himself as a Compass real estate agent, confirmed that he had called Mr. Cribier the day before, and attempted to solicit the listing of Mr. Cribier's home which Mr. Cribier had recently taken off the real-estate market.

77. During this call, Dominic Pacheco provided Mr. Cribier with the web address of his personal webpage on Compass' website – www.compass.com/agents/dominic-pacheco, as well as a contact phone number of (619) 948-1291, and invited Mr. Cribier to visit the website and browse his previously sold listings.

78. After Mr. Pacheco had made his sales pitch, Mr. Cribier explicitly requested that Dominic Pacheco no longer contact him and expressed that he was not interested in Mr. Pacheco's or Compass' real estate services.

79. On or about March 17, 2025 at 6:03PM, and despite having explicitly requested not to be contacted by Compass, Mr. Cribier received the **fourth** unwanted telemarketing call from Defendant, through its agent Ramon Maldonado, again from telephone number (619) 853-6918.

80. (619) 853-6918 is a phone number produced by Compass' autodialing system, and is unique to calls placed by Ramon Maldonado.

81. When Mr. Cribier answered the phone call, Ramon Maldonado introduced himself as a Compass real estate agent and, just as Mr. Pacheco had done on March 12, 2025, Mr. Maldonado attempted to solicit the listing of Mr. Cribier's home.

82. After Mr. Maldonado had made his sales pitch, Mr. Cribier explicitly requested that Mr. Maldonado no longer contact him and expressed that he was not interested in Mr. Maldonado's or Compass' real estate services.

83. On or about March 17, 2025 at 6:13PM, and despite having explicitly requested not to be contacted by Compass just minutes earlier, Mr. Cribier received the **fifth** unwanted telemarketing call from Defendant, through its agent Ramon Maldonado, this time from telephone number (619) 791-9226.

84. Upon Mr. Cribier answering this call, Mr. Maldonado again solicited the sales listing of Mr. Cribier's home, this time highlighting his photography skills, which he insisted could help Mr. Cribier sell his home. Mr. Cribier again ended this call by repeating that he did not want to be contacted further by Compass or Mr. Maldonado.

85. In March 2025, Mr. Cribier filed the instant lawsuit, but that was not enough to deter Compass Agents from continuing to call Plaintiff. Indeed, on February 11, 2026, Mr. Cribier received a prerecorded message with a voice that sounded artificial (including potentially generated by AI or artificial intelligence). The voice had a robotic timbre, a clarity dissimilar to an authentic human voice, and lacked human intonation. Additionally, at the end of the message, the voice cutoff suddenly and crisply in a way that is inconsistent with human speech patterns.

86. This call was placed from the phone number (858)-500-1177. The caller introduced herself as "Robin" on behalf of "Mark Schwartz with Compass real estate." The caller also said the call was about property.

87. Dominic Pacheco and Ramon Maldonado worked as agents for Defendant Compass at the time they made these calls to Mr. Cribier on behalf of Compass.

88. Upon information and belief, "Robin" worked as an agent or employee for Defendant Compass, or was an artificially generated voice used by Mark Schwartz to generate leads, at the time Mr. Cribier received a call from "Robin" on behalf of Compass.

89. Mark Schwartz worked as an agent for Compass at the time a call was made on behalf of Compass.

90. All five (5) calls constituted telephone solicitations pursuant to 47 C.F.R. § 64.1200(c), as they were an attempt to promote or sell Defendant's services.

Specifically, all five calls were made on behalf of Defendant and were intended to solicit and secure the sales listing for Mr. Cribier's home, from which Defendant would earn a percentage of the eventual sales commission.

91. Mr. Cribier never gave Defendant nor any Compass Agent, including Dominic Pacheco, Ramon Maldonado, "Robin", or Mark Schwartz consent to call or text him.

92. Mr. Cribier never gave Defendant nor any Compass Agent, including "Robin" or Mark Schwartz prior express written consent to contact him using a prerecorded or artificial voice.

93. Mr. Cribier did not have an established business relationship with either Dominic Pacheco, Ramon Maldonado, "Robin", Mark Schwartz, or Compass during the time of the telephone solicitations.

94. The telephone number provided by Dominic Pacheco, (619) 948-1291, was the same number that was listed as Dominic Pacheco's contact number on Compass' website. [7]

---

[7] A lookup of Mr. Pacheco's Department of Real Estate License ID confirms that as of February 26, 2026, he is no longer a Compass-affiliated agent. His page on Compass' website was previously available at https://www.compass.com/agents/dominic-pacheco.

95. Dominic Pacheco was listed as a Compass Agent within Defendant's own website, wherein he had a dedicated webpage with his contact information, lists of affiliated real estate property listings, as well as thumbnails to various YouTube videos which feature himself discussing his real estate business.




96. The first and most prominently displayed YouTube thumbnail was entitled "I made 4000 Cold Calls! Here's What Happened", and links to a six-minute video uploaded on February 28, 2024, wherein Dominic Pacheco boasts cold-calling over 4000 phone numbers from expired listings in a calendar month, despite the admitted overwhelmingly negative reactions received from the people he cold-called.[8]

---

[8] Previously available at https://www.youtube.com/watch?v=zYVrKhiTs7w&t=161s (last accessed March 24, 2025). Some time after the filing of the original Complaint

97. The originating telephone number of Ramon Maldonado's March 17 6:13PM phone call, (619) 791-9226, is the same number that is listed as Ramon Maldonado's contact number on Compass' website.

98. Ramon Maldonado is listed as a Compass Agent within Defendant's own website, wherein he has a dedicated webpage with his contact information, lists of affiliated real estate property listings, as well as client testimonials.[9]

99. Mark Schwartz is listed as a Compass Broker Associate within Defendant's own website, wherein he has a dedicated webpage with his contact information, lists of affiliated real estate property listings, as well as accolades and client testimonials.[10]

100. Upon information and belief, Mr. Cribier's phone number was provided to both Dominic Pacheco and Ramon Maldonado by Defendant Compass from a list of recently expired listings in their geographic area, and was obtained by "Robin" and/or Mark Scwartz from a lead list, without regard to whether Mr. Cribier's phone number was on the National Do-Not-Call Registry or whether he provided prior express written consent to be contacted using a prerecorded message.

## ARTICLE III STANDING

101. Defendant sent multiple phone calls to Plaintiff's personal cellular telephone which was registered on the National Do-Not-Call Registry. Defendant likewise sent a prerecorded message using an artificial voice without prior express consent from Plaintiff. Such unwanted phone calls from Defendant are a nuisance, an invasion of privacy, and wasted Plaintiff's time and enjoyment in the use of his personal cellular telephone. All three of these injuries are concrete and *de facto*.

102. Furthermore, Plaintiff was distracted, inconvenienced, and annoyed by

---

and before September 8, 2025, this video was removed from Defendant's former agent's Youtube page.

[9] *Id.*

[10] https://www.compass.com/agents/mark-schwartz/.

having to take time to answer each phone call and engage with an unwanted solicitor.

103. All of these injuries are particularized and specific to Plaintiff, and will be the same or substantially similar injuries suffered by each member of the putative class.

104. The above phone calls were linked to Defendant as they were sent on behalf of Defendant and its agents Dominic Pacheco, Ramon Maldonado, and Mark Schwartz, who are the parties that attempted to solicit business from Plaintiff for theirs and Defendant's financial benefit. These phone calls are the sole source of Plaintiff's and the Class's injuries. Therefore, Plaintiff has illustrated facts that show that his injuries are traceable to the conduct of Defendant.

105. Plaintiff's Request for Relief includes a request for damages for each call made by Defendant to cellular numbers on the National Do-Not Call Registry, as authorized by statute in 47 U.S.C. § 227, *et seq*. The statutory damages were set by Congress and specifically redress the damages suffered by Plaintiff and the members of the putative class.

106. Plaintiff's Request for Relief also includes a request for damages for each prerecorded or artificial message sent by Defendant to residential telephone numbers without the recipient's prior express consent, as authorized by the TCPA. The statutory damages were set by Congress, and specifically redress the damages suffered by Plaintiff and the members of the putative class.

## <u>CLASS ACTION ALLEGATIONS</u>

107. Plaintiff brings this action pursuant to Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of the following classes, of which Plaintiff is a member, which is defined as follows:

> **DNC Class**: All persons within the United States (1) registered on the National Do-Not-Call Registry for at least 30 days, (2) who received more than one phone call or text message (3) made or sent by or on behalf of Defendant, (4) for the purpose of promoting Defendant's goods or services,

(5) within any twelve-month period, (6) within the four years prior to the filing of the original Complaint on March 26, 2025.

**Prerecorded Messages Class**: All persons within the United States, (1) who received a call on their residential telephone line or cell phone number, (2) by or on behalf of Defendant, (3) with an artificial or prerecorded message, (4) without the recipient's prior express consent, (5) within the four years prior to the filing of this Amended Complaint.

108. Excluded from the Classes is Defendant, its officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendant has or had a controlling interest. Also excluded from the Classes is the Court, any judge who has presided over this action, any employees or officers of the Court, and their immediate family members.

109. Plaintiff reserves the right to redefine the Classes and to add subclasses as appropriate based on discovery and specific theories of liability or otherwise alter the definition of each Class as he deems necessary at any time to the full extent that the Federal Rules of Civil Procedure, the Civil Local Rules of the U.S. District Court for the Southern District of California, and applicable precedent allow.

110. **Numerosity**: Upon information and belief, the members of the Classes are so numerous that joinder of all of them is impracticable.

111. The exact number of the members of the classes is unknown to Plaintiff at this time, and can (and will) be determined through appropriate discovery. However, given that, on information and belief, Defendant texted and called thousands of class members nationwide during the class period, it is reasonable to presume that the members of the Classes are so numerous that joinder of all members is impracticable.

112. **Ascertainability**: The members of the classes are ascertainable because the class is defined by reference to objective criteria.

113. In addition, the members of the classes are identifiable in that, upon information and belief, their cellular telephone numbers, names and addresses can be identified in business records maintained by Defendant and by third parties.

114. **Typicality**: Plaintiff's claims are typical of claims of the Classes', as they are similarly affected by Defendant's actionable conduct. Defendant's conduct that gave rise to the claims of Plaintiff and of each Class' members is the same. Plaintiff and the Classes have each suffered the same injury as a result of such conduct. Plaintiff has no interests antagonistic to any member of the Classes.

115. **Adequacy**: Plaintiff is qualified to, and will fairly and adequately protect the interests of the members of the Classes with whom he is similarly situated, as demonstrated herein. Plaintiff acknowledges that he has an obligation to make known to the Court any relationships, conflicts, or differences with any Class Member.

116. Plaintiff's interests in this matter are not directly or irrevocably antagonistic to the interests of the members of the class.

117. Plaintiff will vigorously pursue the claims of the Class Members.

118. Plaintiff has retained counsel experienced and competent in class action litigation. Plaintiff's attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. In addition, the proposed class counsel is experienced in handling claims involving consumer actions and violations of the TCPA.

119. Plaintiff's counsel will vigorously pursue this matter.

120. Plaintiff's counsel will assert, protect and otherwise represent the members of each Class.

121. Plaintiff has incurred, and throughout the duration of this action, will continue to incur costs and attorneys' fees that have been, are, and will be, necessarily expended for the prosecution of this action for the substantial benefit of each Class Member.

122. Commonality: There are common questions of law and fact as to all

members of the Classes, including but not limited to the following:

a. Whether, within the four years prior to the filing of the original Complaint, Defendant or its Agents sent more than one text message or phone call to the members of the Class whose telephone numbers were on the National Do-Not-Call Registry and who had neither an established business relationship nor personal relationship with Defendant;

b. Whether Defendant obtained prior express written consent to send the text messages or calls to Plaintiff or the Class members' telephones;

c. Whether Defendant's calls or texts were made for an emergency purpose;

d. Whether Defendant has established written procedures to comply with National Do Not Call Registry registrations;

e. Whether Defendant trains personnel on any procedures to comply with National Do Not Call Registry regulations;

f. Whether Defendant uses any process to prevent telephone solicitations of any number on the National Do Not Call Registry and maintaining records documenting the process;

g. Whether Defendant's conduct violated the TCPA, and availability of statutory penalties;

h. Whether Defendant maintains and records a list of telephone numbers that it may not contact;

i. Whether Defendants obtained valid prior express consent from artificial or prerecorded voice call recipients;

j. Whether Plaintiff and the Class members were damaged thereby, and the extent of damages for such violation; and

k. Whether Defendant should be enjoined from engaging in such conduct in the future.

123. **Predominance**: The immediately preceding questions of law and fact common to the members of the Classes predominate over questions that may affect

individual members of the Classes. The elements of the legal claims brought by Plaintiff and Class Members are capable of proof at trial through evidence that is common to the Classes rather than individual to its members.

124. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this matter because:

- If brought and prosecuted individually, the claims of the members of the Classes would require proof of the same material and substantive facts.
- The pursuit of separate actions by individual members of the Classes would, as a practical matter, be dispositive of the interests of other members of the Classes, and could substantially impair or impede their ability to protect their interests.
- The pursuit of separate actions by individual members of the Classes could create a risk of inconsistent or varying adjudications, which might establish incompatible standards of conduct for Defendant.
- These varying adjudications and incompatible standards of conduct, in connection with presentation of the same essential facts, proof, and legal theories, could also create and allow the existence of inconsistent and incompatible rights within the Classes.
- The damages suffered by each individual member of the Classes may be relatively modest, thus, the expense and burden to litigate each of their claims individually make it difficult for the members of the class to redress the wrongs done to them.
- Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.
- The pursuit of Plaintiff's claims, and the claims of the members of the Classes, in one forum will achieve efficiency and promote judicial economy.

- There will be little difficulty in the management of this Action as a class action.

125. Defendant has acted or refused to act on grounds generally applicable to the members of the Classes, making final declaratory or injunctive relief appropriate.

126. Plaintiff and the members of the Classes have all suffered irreparable harm as a result of the Defendant's unlawful and wrongful conduct. Absent a class action, the Class will continue to face the potential for irreparable harm. In addition, these violations of law will be allowed to proceed without remedy and Defendant will likely continue such illegal conduct. Because of the size of the individual Class member's claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein.

127. A class action is a superior method for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendant to comply with federal law. The interest of Class members in individually controlling the prosecution of separate claims against Defendant is small because the maximum statutory damages in an individual action for violation of privacy are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

128. Plaintiff and the Class members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful conduct.

129. This suit seeks only damages and injunctive relief for recovery of economic injury on behalf of Class members and it expressly is not intended to request any recovery for personal injury and claims related thereto.

## COUNT I

**Violation of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)**

**By Plaintiff on behalf of the DNC Class**

130. Plaintiff re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

131. Plaintiff and members of the DNC Class received more than one marketing text message or phone call within a 12-month period, sent by or on behalf of Defendant, for the express purpose of marketing Defendant's goods and/or services without their written prior express consent.

132. At all relevant times, Defendant knew or should have known that its conduct as alleged herein violated the TCPA.

133. Defendant sent at least two unsolicited and unauthorized text messages and/or phone calls to the cellular telephones of Plaintiff and the DNC Class members, cellular telephones which were registered with the National Do-Not Call Registry, for the purpose of marketing goods and/or services to Plaintiff and the Class.

134. Defendant knew that it did not have prior express written consent to send these text messages and/or phone calls, and knew or should have known that it was sending text messages or making calls to cellular numbers on the National Do-Not Call Registry in violation of the TCPA.

135. Defendant willfully or knowingly allowed text messages and/or phone calls to be sent to Plaintiff's and DNC Class members' cellular telephone numbers on the National Do-Not Call Registry. For instance, Defendant could have determined from a review of its own business records and the National Do-Not Call Registry that it could not contact Plaintiff and/or DNC Class members, yet disregarded such information and placed illegal and unwanted solicitation text messages and calls.

136. Defendant's text messages and/or calls caused Plaintiff and members of the DNC Class actual harms including, but not limited to, invasion of their personal privacy, aggravation, inconvenience, nuisance and disruption in their daily lives, reduction in cellular telephone battery life, data, and loss of use of their cellular telephones.

137. Because Defendant knew or should have known that Plaintiff's and DNC Class members' cellular telephone numbers were on the National Do-Not Call Registry, the Court should treble the amount of statutory damages available to Plaintiff

and the other members of the putative DNC Class pursuant to § 227(c)(5) of the TCPA.

138. As a result of Defendant' violations, Plaintiff and the DNC Class Members are entitled to an award of $1,500.00 in statutory damages, for each and every willful or knowing violation, pursuant to 47 U.S.C. § 227(c)(5)(C) or in the alternative an award of $500.00 in statutory damages, for each and every negligent violation, pursuant to 47 U.S.C. § 227(c)(5)(B).

139. Plaintiff and the DNC Class are also entitled to and seek injunctive relief, pursuant to 47 U.S.C. § 227(c)(5)(A), prohibiting such conduct in the future.

140. Plaintiff also seeks an award of attorneys' fees and costs on behalf of Plaintiff and the DNC Class.

## COUNT 2

### Violation of 47 U.S.C. §§ 227(b)(1)(A)(iii) and (b)(1)(B)

### By Plaintiff on behalf of the Prerecorded Message Class

141. Plaintiff re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

142. The TCPA prohibits a caller from initiating any telephone call to a residential telephone line or cellular line using an artificial or prerecorded voice to deliver a message without the prior express consent of the contacted party unless the call is made solely to collect a debt owed or guaranteed by the United States or is exempted by an FCC rule or order.

143. Defendant initiated telephone calls using an artificial or prerecorded voice to deliver a message to the residential telephone lines of Plaintiff and other members of the Prerecorded Messages Class. Where calls were initiated by the Compass Agents, they were done so with the authorization, knowledge, and/or ratification of Defendant, and on Defendant's behalf.

144. Defendant knew that it did not have prior express written consent to send these text messages and/or phone calls, and knew or should have known that it was sending text messages or making calls to cellular numbers on the National Do-Not Call

Registry in violation of the TCPA.

145. Defendant failed to obtain prior express consent from Plaintiff and from members of the Prerecorded Messages Class to initiate such calls.

146. By initiating unsolicited telephone calls to Plaintiff and to members of the Prerecorded Messages Class' cellular and residential telephone lines without prior express consent, and by using artificial or prerecorded voices to deliver messages, Defendant violated 47 U.S.C. §§ 227(b)(1)(A)(iii) and (b)(1)(B).

147. Defendant's text messages and/or calls caused Plaintiff and members of the Prerecorded Messages Class actual harms including, but not limited to, invasion of their personal privacy, aggravation, inconvenience, nuisance and disruption in their daily lives, reduction in cellular telephone battery life, data, and loss of use of their cellular telephones.

148. As a result of Defendant' violations, Plaintiff and the DNC Class Members are entitled to an award of $1,500.00 in statutory damages, for each and every willful or knowing violation, pursuant to 47 U.S.C. § 227(b)(3)(C) or in the alternative an award of $500.00 in statutory damages, for each and every negligent violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

149. Plaintiff and the Prerecorded Messages Class are also entitled to and seek injunctive relief, pursuant to 47 U.S.C. § 227(b)(3)(A), prohibiting such conduct in the future.

150. Plaintiff also seeks an award of attorneys' fees and costs on behalf of Plaintiff and the Prerecorded Messages Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, respectfully requests the following relief:

- An order certifying this matter as a class action with Plaintiff as Class Representative, and designating Plaintiff's counsel as Class Counsel.
- Injunctive relief prohibiting Defendant from engaging in such conduct in the

future pursuant to 47 U.S.C. §§ 227(b)(3)(A) and (c)(5)(A);

- Statutory damages of $500.00 for Plaintiff and each member the Class for each and every one of Defendant's negligent violations of 47 U.S.C. §§ 227, *et seq*. pursuant to 47 U.S.C. §§ 227(b)(3)(B) and (c)(5)(B);
- Statutory damages of $1,500.00 for Plaintiff and each member the Class for each and every one of Defendant' knowing or willful violations of 47 U.S.C. §§ 227, *et seq*. pursuant to 47 U.S.C. §§ 227(b)(3)(C) and (c)(5)(C);
- Costs of suit;
- An award of attorneys' fees, pursuant to, *inter alia*, the common fund doctrine;
- Pre-judgment and post-judgment interest on monetary relief; and
- All other and further relief as the Court deems necessary, just, and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, individually and on behalf of the Classes, demands a jury trial on all issues so triable.

Dated: August 13, 2026

Respectfully submitted,

**TYCKO & ZAVAREEI LLP**
*/s/ Sabita J. Soneji*

Sabita J. Soneji (SBN: 224262)
ssoneji@tzlegal.com
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950

Gemma Seidita (SBN: 322201)
gseidita@tzlegal.com

Hassan A. Zavareei (SBN: 181547)
hzavareei@tzlegal.com
2000 Pennsylvania Ave., NW, Suite 1700
Washington, DC 20006
Telephone: (202) 973-0900

**MADAR LAW CORPORATION**
Alex S. Madar, Esq. (SBN: 319745)
alex@madarlaw.net
630 1st Avenue, Suite 219
San Diego, CA 92101
Telephone: (858) 299-5879
Facsimile: (619) 354-7281